Alright, well it's still good morning, so welcome back. And we will now call the case of American Society of Journalists and Authors, Inc. National Press Photographers Association v. Xavier Becerra, Attorney General. And that's 20-55734. Each side has 20 minutes, so we will proceed with you Mr. Manley. Thank you, Your Honor. Good morning, and may it please the Court. I'm James Manley, and I represent the Plaintiff's Appellants. I'd like to reserve five minutes for rebuttal, please. There are two primary reasons that the District Court should be reversed and the case remanded for entry of a preliminary injunction. First, strict scrutiny applies. The professional services exemption imposes content-based burdens on what freelancers can say. What they say determines how they're regulated. So a freelancer could work on a journalism project in the morning and a marketing project in the afternoon, and different rules would apply based only on the type of speech that she's producing. So it's very similar to the statute. When you say type of speech, there really isn't any content being regulated in the sense that it doesn't turn on the content of the speech. Well, what the Supreme Court told us in Sorrell is that marketing is a form of content. And so when a law like in Sorrell makes a distinction between journalism and marketing, that's a content-based distinction, and that's the same content-based distinction we have here. So it's similar to the statute that this Court subjected to strict scrutiny in Pacific Coast Horseshoe School v. Kirchmeier, where different rules applied to different schools based on the type of school. Well, but in that case, that case was saying there were certain educational areas that aren't going to be taught as a result. And so that's directly impacting the speech. That's saying, you know, you can't teach this in this area. That's not what's going on here. I believe it is, Your Honor. First of all, even if this was an incidental burden on speech, it would be a burden based on content, because what the freelancer is saying determines how the freelancer is regulated.  But it's a direct burden here because you have to be an employee to engage in certain forms of expression. Freelancers can't communicate through video for broadcast news, television, and other formats. And freelancers can't sell their work if it replaces the work of an employee. So there is a direct regulation on speech in this case. Are you making a facial or an as-applied challenge, or both? Both, Your Honor. As applied to our members who are journalists and freelance writers, and on the face of the statute as well. Is it your position that states implicate the First Amendment whenever they treat the quote-unquote speaking professions differently? No, Your Honor. The problem here is that the state is treating different speakers differently. And so just as the state was treating different schools differently in Pacific Coast, it's treating different freelancers differently based on what they're saying. So if we were to apply the same logic from Pacific Coast, if the state had applied the ability to benefit restriction to schools that teach journalism or videography, but not marketing or fine arts, that would be the same situation we have here. Or if the state had said recreational schools can have adjuncts teaching, but vocational schools have to hire full professors, that would be the same situation we have here. So the problem is that the state is treating different speakers differently. I understand that argument, but it's not exactly the same as Pacific Coast, because in that situation, as Judge Seaborg has already referenced, if you were not complying with the regulation, then the speech doesn't get to happen at all. And that's not the case here. I mean, you would just do it a different way. You would do it as an employee instead of as an independent contractor. And I understand your next argument then is, well, functionally, it is a bar because the economic realities of that distinction make it so that an avenue gets foreclosed. The employment avenue is actually not viable. But that's not the same as Pacific Coast. I mean, you've got another layer of removal, I guess, from what the First Amendment seems to really be about. Well, certainly. And I think if we step back and say whether it's a ban or a burden here, the law treats different speakers differently. And so there wasn't really a ban in Pacific Coast. Your students had to pass this test before you could teach the particular types of instruction, whether it's vocational or recreational. And here you have to treat different speakers differently based on the content that they're producing for you. And so there's the same bar to producing the speech unless you fit into one of these content-based boxes. Now, the state wants to say that this is an occupational classification and it's based on the status of the worker, not the content they're producing. But what defines the status? What defines the occupational classification? The state doesn't say. And the district court couldn't say. The status of the worker, the occupational classification, depends on what the freelancer is saying. So the distinction between freelance journalism and freelance marketing or freelance fine art and freelance photojournalism depends entirely on the communicative content of the speech. And so even if we talk about this as a speaker-based burden, it's still a burden that is based on what the person is saying. It's a content-based burden for that reason. Well, it seems a little slapjack-y here that in terms of first you have Dynamex and then the state decides to make a codification of that, and then it seems like then they start coming out with all of these exemptions, and I think you're more exempt now than you were when you started this litigation, right? You made some progress, but you didn't get a complete exemption, right? No, Your Honor. The core dispute between the parties is the same, whether the state can make these content-based distinctions between favored speech and unfavored speech. That's the same dispute. And the nuances between the statute, between AB 5 and AB 2257, the state agrees that it's subject to the same constitutional analysis. And the burden on my client's members is the same. The video restriction is largely unchanged. It's still a restriction on freelancer shooting video, which is inclusive of but not limited to the examples that are in the statute. The video restriction is very similar. And we still have volume restrictions because freelancers are not allowed to replace employees at the same volume. So the burdens are very similar. And the fundamental constitutional problem is entirely unchanged, and I think the parties agree on that. Practical matter, how does it affect you? If you have to be an employee to speak, how does that affect the content of your speech? Right. Well, as Judge Forrest points out, practically speaking, it can mean that you can't speak because it's more difficult to get a job as an employee than it is to sell an individual piece of journalism as a freelancer. And the state talks about this panoply of rights and protections that are available to employees. But they don't dispute that freelancers who divide their work among multiple clients rarely qualify for those benefits because of tenure, accrual, and use rules, not to mention the practical problems of figuring out how those benefits would be calculated when freelancers have a multitude of clients. And then layered on top of that is the fact that they lose their ability to function as independent micro-businesses, where they can deduct expenses, where they can provide themselves with meaningful benefits. Going back to some of the initial questions, that has nothing to do with what they're saying. It's not going to turn on the substance of what they're trying to say. It's whether or not they're replacing someone who otherwise had been an employee before. It doesn't matter. It's completely divorced from the content of the speech. It only depends, Your Honor, on whether they're replacing an employee if they don't fit into one of these content-based categories. So if you're engaged in speech, the state can... Well, you keep saying content-based categories. They're not content-based categories as far as I can see. You're talking about categories in the sense of you're a marketer or you're a fine artist or whatever. It's not content-based. But what distinguishes those categories, Your Honor? If you're producing marketing material or you're producing journalism material, the distinction is in the function and purpose of that speech and the communicative content of that speech. And so if your speech fits into the marketing category, if it fits into the graphic design category, or if the state deems your photographs to be fine art rather than photojournalism, then you are not subject to all of these restrictions on freelancing. You're assuming very specific delineations between these categories, that if you're a fine artist, you're saying something that's very different than what a freelancer is saying. And I'm not sure I see where those clear lines are in place. And therefore, I don't see that it has any impact on impinging on what the speaker is saying. It certainly doesn't impinge on the viewpoint that they can express. But the problem with the way that the statute is set up is that the state has to go in and say, is this fine art, is this photojournalism? And when the state is making that determination, the only thing it's looking at is the content, the communicative content, the function and purpose of the expression. That's a content-based distinction that's subject to strict scrutiny. Well, so if the Fair Labor Standards Act, implementing regulations draw many of the same lines as Section 2778 does. For example, they exempt certain painters, novelists, journalists, as well as others who work in the field of artistic and creative endeavor. Are those regulations unconstitutional because they don't exempt all speakers? It's not that the regulations don't exempt all speakers. It's that the statute here takes certain speakers and gives them preference over other speakers. And so if you're marketing, graphic design, grant writing, fine art, or related to sound recordings and musical compositions, you're subject to a different set of rules from the other speakers that are identified in this statute. And so that's the problem. There are two sets of rules that apply in this statute based on the type of speech, the function and purpose. But I guess I asked you earlier, is your argument that they're treating speakers differently? And you said, no, that's not our argument. But then that sounds like what you just said, that they are treating speakers differently. What I meant, Your Honor, is that the state doesn't have to have special rules for speakers. The state could just have a generally applicable labor regulation that applies to everyone. They could have a generally applicable labor regulation that applies to all speakers without regard for the content. But when we get into this question about what defines the occupational classification, and the state is looking at the content of the expression, then strict scrutiny applies. And that doesn't mean that the law is necessarily unconstitutional. It just means that the court has to apply strict scrutiny and that the burden is on the state to justify that. Well, in this case, strict scrutiny wasn't applied, if that's the standard. I think, but didn't the judge say something about intermediate at best? Putatively, I suppose intermediate scrutiny, that was the standard the judge said might apply. But if we look at what the state actually put forward, a single committee report that didn't reference the professional services definition, didn't explain the distinctions that it draws, it's plainly inadequate to carry the state's burden under intermediate scrutiny. And it was especially improper for the district court to credit that conjecture at the motion-to-dismiss stage. So, certainly not strict scrutiny, Your Honor. That was not applied below. So, if you cannot show that this implicates the First Amendment, do you lose? No, Your Honor. Because you have an equal protection argument, right? We also have an equal protection argument. And what this court said in Merrifield v. Locke here is that claims like this are subject to the principle of non-contradiction. And so the state's interest in protecting workers, the state's interest here is in protecting workers who are under greater control and direction from clients that are more likely to be treated like employees. But here, the group that is more likely to be misclassified is subject to less restrictive freelancing rules. So, a freelancer who's drafting marketing materials or a grant application for a particular client who's producing this product for the client that the client wants to have a particular outcome from is much more likely to be under the control and direction of that client than a freelance journalist who is simply expected to produce the material in a professional and timely manner. If we find that there's no First Amendment implications here, your equal protection claim is then analyzed under rational basis, right? Yes, Your Honor. You don't think the state has shown rational basis support for 2257? Well, as I said, I believe that the distinctions that the statute draws violate this principle of non-contradiction that the court set out in Merrifield v. Locke here. But also, if we look at what's in the record right now, all we have is assumptions about what the state might have considered. We don't have anything in the record that actually supports the specific distinctions that the state has drawn here. So, if you look at a case like Allied Concrete where the court applied rational basis, the court identified specific differences that justified the differential treatment there and then alluded that there were many more than the three specific distinctions that the court identified there. Here, we don't have anything in the record to justify the distinctions that were drawn by the professional services exemption. I'm at five minutes, so I'll reserve. You want to reserve? Okay. Thank you. Thank you. You have to unmute. Yes, thank you, Your Honor. Good morning. Jose Zelon Zapata, Attorney General's Office for Defendant. May it please the court. While the First Amendment protects the free speech rights of the press, it does not exempt members of the press from generally applicable economic regulations. The Supreme Court has made clear that the Constitution does not prohibit states from enforcing restrictions targeting commerce or conduct, which might have incidental burdens on speech. What we have here, which I think the questioning and the responses that the opposing counsel had, what that underscores is that we have here is a generally applicable law that targets the employment classification. How is it generally applicable when it draws a myriad of distinctions between professions, many of which engage in some form of speech? Your Honor, that's a good question. And this court answered that question in a slightly similar context in addressing another challenge to AB 5 recently in a case called California Trucking Association that involved a preemption claim. But basically what the court was saying there was that generally applicable doesn't mean that it has to apply to every single industry. By definition, every single piece of legislation might have exceptions that for whatever reason the legislature deems is appropriate given the particular purpose behind the law. What we have here, and I think it's important to emphasize this, is this broad-ranging law that tries to revamp how workers are classified as either employees or independent contractors. AB 5 is the legislature's attempt to follow up on the California Supreme Court's decision in dynamics and to address concerns regarding misclassification and wage theft and the erosion of the middle class. So because it's such a wide-ranging statute that basically sets a presumption for all classifications or for all hiring arrangements, there's a number of exemptions, as Your Honor pointed out, in order for the legislation to address certain classifications. When I look at it, it kind of seems like the people that got the best exemptions probably had the best lobby. I'm having a hard time really sort of understanding why certain exemptions came about. I mean, isn't the distinction between speech and services somewhat tenuous when dealing with the speaking professions? After all, in many cases, the speech is the service provided. So I'm having a hard time understanding how these exemptions are happening. It just doesn't... that's giving me trouble. Well, Your Honor, I think what's important to focus on, though, is the particular classifications, while they might incidentally affect occupations that seem to focus on speech, what the legislative scheme actually talks about is and what it focuses on in terms of the exemptions are the particular context or the particular occupation and peculiarities of these occupations as they pertain to the misclassification concerns that animated the statute to begin with. So the legislative history demonstrates that the legislature was thinking about the particular hallmarks of an independent contractor versus an employee. So the legislative history talks about how individuals who are independent contractors tend to have more independence. So there tends to be less of an inequality of the bargaining power in occupations that are traditionally independent type of situations as opposed to individuals who are employees. So these classifications, even though they might not have some full-blown discussion regarding the rationale behind them, are, as the legislative history demonstrates, are the legislature's attempt to try to parcel out particular occupations where misclassification is more likely to be a concern than other ones. So besides the ones that the plaintiffs focus on... What about the replacing? You have to replace another employee. Wouldn't any worker move more closely resemble an employee if he or she replaces an employee and performs the same amount of work? Why doesn't that condition apply to the Dynamex exemptions for marketers, graphic designers, and others? And, Your Honor, I think what your question highlights is the fact that there are potential arguments either way for why the legislature might have decided to put in particular conditions for the application of an exemption. But this particular, the language that Your Honor was reading from, I think it's kind of interesting to look at this particular, the gestation of this particular exemption because initially at the district court, the plaintiffs focused on AB5 as it originally read, and under that particular iteration, this exception was limited to individuals who had a maximum of 35 submissions per year. Now, through the legislative process, individuals brought some concerns to the attention of the legislature and said, we do not think that's realistic. Does that mean that the original one, when it was tied to 35 submissions, was that unconstitutional? No, Your Honor, it does not. It just illustrates the fact that the legislative process evolves in order to address particular concerns. And would you be just as comfortable defending the original as you would be 2778? Yes, Your Honor. Yes, I would be. At the same time, I would point out, because this was alluded to to some degree in the questioning earlier, that there is this procedural problem because what we have here is a challenge to a statute that the plaintiff's original challenge in the district court was to a statute that no longer exists. They challenged AB 5, which was subsequently amended by AB 2257. I submit to the court that the rationale that the district court applied, which is fully consistent with principles from this court and the Supreme Court, that for those same reasons, plaintiffs' newfound challenges under AB 2257 fail for the same reasons. But if not, this court should remand for the district court to address those issues in the first instance. Why don't cases like Minneapolis Star apply here, at least as to the extent plaintiffs are making an as-applied challenge? I mean, they've put information on the record to suggest that under this new regulatory scheme, that certain freelancers in California just aren't going to get work anymore because the employers aren't going to hire them as employees, and even if they did, they wouldn't want those jobs. So they're going to go to non-Californians. Why wouldn't Minneapolis Star instruct us on what we should do? Well, Your Honor, since you focused specifically on Minneapolis Star, then the concern is on the First Amendment challenge, and I submit to the court that the particular effect of this legislation is not a consideration for purposes of the First Amendment analysis. Now, specifically, Minneapolis Star submits to the court that it actually supports our claim. That case, as the Supreme Court and this court has made clear in subsequent decisions, addressed an overall taxation scheme that seemed to be widely applicable, but the structure of the particular exemptions demonstrated that it really focused on aspects of the press. Similarly with the Arkansas case, which similarly had exemptions that were actually based on the particular content of the publications at issue. So, for example, general interest magazines were not included within the exemption from the particular taxation scheme. That's not what we have here because what we have here is, under AB 5, a law that classifies individuals as employees or independent contractors. It does not limit their ability to speak on any particular topic. It is not addressed, like Judge Seaborg pointed out, the trigger for the particular exemptions does not hinge on the particular content that these occupations would be publishing or be trying to disseminate. But I think we get the argument when you're talking about marketing, and I heard your colleague on the other side, Mr. Manley, make this argument. I think the Supreme Court's explained that marketing is speech with a particular content. So, if the law distinguishes between marketing services and other services, does it necessarily impose content-based burdens? And I think he says it does, so I want you to respond to that. Well, the answer is no, Your Honor. I submit to the Court that that particular statement is taken slightly out of context. What the Supreme Court dealt with in the Sorrell case was a particular piece of legislation that said this particular type of prescription information cannot be disseminated, but there were exemptions that were based on the actual content of the use. So, for example, for educational purposes, it could be used, but not for some type of commercial types of situations. So, what the Court was looking at in concluding that that particular piece of legislation was content-based is the fact that the exemption specifically hinged on the use and the content, whether it was educational. That's not what we have here. AB 5 does not say photojournalists, videographers who work under a written contract are exempt from the ABC test as long as they write about a particular topic, about politics, about sports. It just talks about the occupations in terms of an occupation, and while we have been focusing on that particular aspect of the exemption, I think it's important to also look where it falls from. This falls within the scheme of a professional services exemption, and the other categories. We're talking about marketers, administrators of human resources, travel agents, licensed estheticians. So, what this demonstrates is that this case is far afield from the Minnesota case. It's far afield from Sorrell because what is obvious from the legislative scheme is that the legislature was concerned with misclassification and was concerned... I mean, I guess I'm still struggling with the same points that I was asking about. That makes sense in a facial argument, a facial challenge argument, but not necessarily in an as-applied. I mean, in an as-applied, we look at on the face, looks neutral, but when it gets to actually putting this thing into practice, then certain speakers, certain industries that are specifically connected to speech are being burdened in a way that others aren't. And I guess I'm still not sure what your position is on that. Well, Your Honor, I thought that was interesting that Judge Callahan raised the question about whether this is a facial or an as-applied challenge, and I was a little bit puzzled by the response to that because we don't have a situation here where a particular application of AB 5 is being challenged. What we have here is a challenge to the statute overall. Now, plaintiffs are seeing if the statute is applied a particular way to these particular individuals, it could violate the Constitution, but I'd submit that that's still not an as-applied challenge as the Supreme Court has defined it. Now, perhaps there are potential situations where a particular individual might say, well, I am going through a classification proceeding and I've been found to be an employee, and I think this violates my rights. That would be a true as-applied challenge, and in that particular situation, we would be able to address the particular circumstances of that individual and how the statutory scheme play out. So, I understand your position that you think that this is just a facial challenge and that's all that we should be facing, and in that circumstance, then I guess you would also probably think that we shouldn't even be looking at the declarations the plaintiffs have put into the record. We're just looking at the statute. Yes, Your Honor. I think that's correct because of the fact that what we have here is the district court's dismissal after the plaintiffs decided not to amend. The particular declarations really addressed more the issues at the context of the preliminary injunction, which this court dismissed in the previous case related to this action. So, yes, I think that's correct. So, what would this court have to find to determine that the intermediate scrutiny is the correct standard? Well, Your Honor, I think what this court would have to decide is that, and this is supported by the record here, that this is a generally applicable economic regulation and that it addresses commercial conduct rather than speech. And I think what's particularly helpful, Your Honor, actually was in the court that decided the inter-contracting case, and the particular iteration of the test, I think, would be helpful in this situation. What you wrote for the court there is that in order to trigger First Amendment scrutiny, a conduct-based law must, one, target a particular type of entity for differential treatment, and two, regulate the ingredients necessary to effectuate that entity's First Amendment rights. Now, what we have here is we don't think the plaintiffs can even show that AB 5 targets a particular type of entity because there are a number of exemptions, not just the particular one that they focus on that applies to them, but even within that category, there are a number of other exemptions. So there's no strong argument that AB 5 targets a particular type of entity. But secondarily, I think it's important to focus on whether the law, quote, regulates the ingredients necessary to effectuate that entity's First Amendment rights. We don't have a situation here like the Minneapolis case, or the Minnesota case, rather, where the law was taxing the use of the press by certain inks that only the press used, or only presses used in that particular situation. What we're talking about here is the classification of an individual as an employee or an independent contractor. This is not a statute like the plaintiff's focus of length about legislation regarding signs, whether a particular, in the Reed case, for example, a law that says signs that concern a particular topic can only be posted. I got that one wrong, so I'm, you know, I got that one wrong, so we know that. Well, Your Honor, I think what that highlights is sometimes the figuring out what these first-minute issues is definitely not the most— Well, that's what—it's counterintuitive. That's what I mean. You know, every time the Supreme Court has a decision, it seems like it makes it harder. It's not that we're not trying to apply the precedent, but it's—that was, you know, that obviously implicated the First Amendment, and I thought it was a directional sign, okay? Well, on the other hand, Interfive Contracting, which I was focusing on, Your Honor got it right because the Supreme Court denied cert. So I think it's helpful to look at that and say, what is it that the law is actually doing? If a law is focusing either because there's something apparent in either in the statutory language or because background such as legislative history or the way the statute works in practice demonstrates that there's actually a focus on the communicative aspect of the press or the plaintiffs, then you have a First Amendment problem. Other than that, you really have a generally applicable law. You have a law that addresses conduct rather than speech, and therefore, at most, intermediate scrutiny would apply. Let me ask you on the particular exemption, the motion picture workers being not exempt from Dynamex, and then videographers, as I understand it, are exempt, if I've got that right. How would that distinction even pass rational basis? I mean, what is in the record that would show why that distinction would be made? Well, Your Honor, if we're talking about rational basis, then I'm assuming you're focusing on the equal protection challenge. Equal protection, right. Yes, I think what you'd have to go back to is the differential standard that's applicable for equal protection challenges where there isn't a suspect classification or a fundamental right, which there isn't. Which plainly, that's where we are now, but in rational basis is very, I realize, forgiving standard. But it's got to be, you got to have some explanation. Yes, Your Honor. But in that situation, it is the plaintiff's burden to negate every potential basis that the legislature might have had for making that particular distinction. The case law talks about how the particular determinations of the line drawing that the legislature might make on the rational basis is not subject to scientific fact finding or scientific inquiry. And the reason for that is because a lot of this type of socioeconomic legislation, the legislature is trying to address a problem. And sometimes it's addressing the problem incrementally. And I'd submit that that's what the record demonstrates here. And there is more inference here based on what's available in the legislative history, which does not necessarily address every single exemption. Let's assume if intermediate scrutiny is the correct standard. Was it premature for the district court to dismiss this case without evidence on that? No, no, it wasn't, Your Honor. Since intermediate applies here, as we have argued, then the district court properly went ahead and assessed the claim. The district court concluded that under intermediate scrutiny, there has to be an important or substantial government interest. And here there was that because there was a concern set up by the legislative history in correcting misclassification. And the court concluded, and we also think this is all supported by the record, that that particular interest can be justified without reference to the content of the expression. And the law does not, has at most an incidental impact on speech. So under that standard, the district court went through the legislative history, went through plaintiff's challenges and properly dismissed this case at that juncture. This is not the type of situation where there's further fact finding on those particular aspects that's necessary. Now, on the equal protection challenge, the standard would be even more lenient and more deferential. Now, the plaintiffs argue on appeal that the district court somehow improperly engaged in speculation and that that was not something that it should have done under a rational basis. But the case law demonstrates that given the lenient standard, it's applicable. It is the plaintiff's burden to negate every potential basis that the legislation could have. The legislature is allowed the opportunity to address problems in an incremental basis, as in the showing that there's a specific classification or a fundamental right and the district court properly applied those precedents here. Unless there's any further questions, I don't really have anything else that I'd like to address. I just want I just urge the court, the district court. Judge Gutierrez went through the applicable legal standard. It recognized that this was a piece of legislation that did not address speech, but instead attempted to address misclassification concerns, which the legislature deemed were significant. The district court properly applied intermediate scrutiny on that basis and found that AB 5 does not have more than at most an incidental burden on speech. It is the type of commercial regulation, generally applicable regulation that legislations can enforce. And therefore, it did not buy the First Amendment. And under rational basis, plaintiffs did not show or meet their burden to show that the legislation was like any potential rational basis. And therefore, we reach the court to to affirm the district court's dismissal. Thank you, Mr. Zeldin Zepeda. Thank you. All right. We'll go back on for rebuttal. Mr. Manley, your honor. Thank you. I heard Mr. Zeldin Zepeda talk about why the state drew these distinctions to to address misclassification. Now, there's no evidence to support that in the record regarding these classifications that we challenge here. But that skips over the first step in answering what are the classifications. And when the state makes classifications based on the function and purpose of speech, that's a content based distinction. It doesn't matter, as this court said in Boyer versus city of Simi Valley, if the reasons the state has are prudent, if they're reasonable, if they're even rational. If the law allows some messages, but not others based on content, that's subject to strict scrutiny. And here, if the freelancer is communicating a journalism message, they're they're subject to harsher rules than if they're communicating a marketing message, for example. Doesn't that go back to Judge Callahan's question to you that you rise or fall on the First Amendment? I mean, if the first that that assumes that we find that the First Amendment is implicated in its speech, if we find that not to be the case, you really don't have anything left. If the First Amendment is not implicated, if first of all, if the First Amendment is implicated, as as my colleague says, that that intermediate scrutiny applies. If intermediate scrutiny applies to the First Amendment claims, it applies to equal protection claims. But if we're under rational basis, then then I submit to the court that the distinctions drawn by the professional services exemption defy the principle of non-contradiction. Your counterpart says that it's your burden at that point to negate effectively any any any rational basis. Is that right? And it is our burden. And we should have the opportunity to do that. We should have the opportunity to develop a record that demonstrates that what we've alleged is that is that this is this is just naked favoritism. And I think that the scattershot way that these that these exemptions apply, the way that that they've only doubled down on on these, the scattershot approach to these exemptions in AB 2257 demonstrates that our allegations were reasonable and that we should be allowed to develop that develop a record to support them. Before your time runs, we talked a little bit about this in your first argument. But the biggest concern that I have with your argument is that the way you're defining or using the term content based, in my mind, means that any occupational categorization is going to be implicated because occupations, people in occupations communicate. So if you favor one form of communication via an occupation over another, we're implicating the First Amendment. And if that's true, then how can we ever regulate based on occupation? I mean, this is I guess this is a concern that sort of goes beyond this case, but I'm not sure how we look at the California statute and accept your argument and then not also implicate a problem with as such. Callahan raised the federal statute that makes occupational distinctions. I think the distinction here, Your Honor, is if we look at the professional services exemption, it it takes these different types of speech and subjects them to different categories of regulation. So it's it's a it's self-contained. And within this statute, how you're speaking dictates how you're regulated. And so that's that's different from just looking at any regulation that burdens speech. Generally, we have we have a peculiar kind of regulation here where the state has has taken this scattershot approach to exemptions that's created this this array of exemptions that that rise and fall based on on what you're saying. It's not a situation where the state has just said, you know, journalists are subject to this minimum wage. Although if the state did that, then the International Franchise Association case makes clear that that that sort of burden would be subject to First Amendment scrutiny. But we have a very similar burden here. If you're if you're a freelancer producing journalism content, you're subject to more restrictive rules that make it harder to work as a freelancer than if you're producing other types of preferred content. Just very briefly on the issue of the procedural issues, I want to direct the court to the briefing on the motion to supplement the record where we cite Fairman's Fund and the case that it relies on public service company of Colorado versus Shoshone-Bannock tribes. In both those cases, the law that was challenged originally was changed during the appeal, but the core issue remained the same and the parties seem to agree the core issue remains the same here. Then finally, the preliminary injunction is before this court. And as the court said in Arc of California versus Douglas, when the district court dismisses for the same reasons it denies the preliminary injunction, this court reviews those those decisions together. Let me ask you this, though, because it is a different. All right. It is a different statute. But if the core issue is the same, is there anything procedurally if and since you acknowledge that it's your burden to refute what what the legislature says, if we if we hypothetically held that it was rational basis, did you have that opportunity in the district court to refute that? Their reasons? We did not, Your Honor. We did not have that. We're on a motion to dismiss. The only opportunity we've had is to present evidence in support of our preliminary injunction, which was premised on the notion that that at least intermediate scrutiny applies. Any additional questions of the panel? All right. I think not. Thank you both for your helpful arguments. You're both obviously very well versed in the case, and we appreciate that in a very difficult case. And so this court now will actually stand in recess for the week. So thank you. Have a good weekend, everyone. And judges, we'll go to the roving room. This court for this session stands adjourned.
judges: Callahan, Forrest, Seeborg